The next case this morning is 521-0140 People v. Scott Langford. Arguing for the defendant appellant is Douglas Hoffman. Arguing for the state is Becky Ray. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Okay, just for clarification, the clerk announced Douglas Hoffman and I see Mr. Johnson on the screen. Correct, Your Honor. Okay, so the record will be so clarified. Mr. Johnson, you're for the defendant? Yes, Your Honor. Okay, you may proceed when ready then. Thank you. May it please the court. My name is Doug Johnson and I represent the defendant, Scott Langford, who is currently serving 13 years on various convictions associated with the discharge of a firearm. I'd like to address the fourth issue we raised in our brief. First, if I could, which is the amount of firearms evidence that was admitted against Mr. Langford. In this case, of course, it is undisputed that the gun, the firearm that was fired was never located. So we don't know a lot about it. What we do know came from the state's expert, Monet, who testified that he examined the scene where the discharge occurred and he examined some shells from the place where the discharge occurred. And what he learned was that there were birdshot pellets. So we know that much. Birdshot pellets were fired and we know that they were fired from a shotgun. That's what he was able to ascertain. He also ascertained that the firing from where the pellets ended up was about five feet away. Did he give a gauge? He said that it was not a 12 gauge. He said, and what I've learned from this case, I guess that a 20 gauge is smaller and a 28 is smaller. So it was a 20 gauge or smaller is what he said. It would not have been a 12 gauge. He said that if it had been a 12 gauge, one would not use a 12 gauge because they would risk harming themselves if they fired this type of bird pellet. So that's what we know about from his examination of the scene. He also looked at three shells that were located. And he said those were, those shells are so old, they don't make them anymore. And he was unable to ascertain if they would have worked or not. They could have worked, they may not have. He did say that those shells could be loaded with the birdshot pellet. It's possible to have loaded those types of shells with the birdshot pellet that he saw on the ceiling or in the area. But in the, as did the quote of what he said when asked, now the three shotgun shells you recovered, what kind of device would those typically be used for? And he said, a shotgun, but not a 12 gauge shotgun, maybe a 20 gauge shotgun. And then he also said it would be possible that the shells could be used for, the ammunition could use for a pump action shotgun. But in the end, it seems that he narrowed it down. I think I read that there were over 100 million shotguns in the United States in private ownership. So he narrowed it down to millions and millions and millions of shotguns. And he also was asked about whether further testing or analysis could have been done on the gun or on the pellets at the scene or on the shells to get closer to what type of firearm this was, since it was so important to the case. And he said that, yes, there were things that could have been done. Those shells could have been loaded and fired to see the pattern that they created. Um, the fingerprints could have been taken, checked on the shells. DNA, I believe there was some talk about DNA that was collected from the shells, but never analyzed. And he said all those things could be done, but in the end, they weren't. And there are very many, there are a lot of variations, he said, of shotguns. And it all depends on barrel length, whether there's a smooth bore, 18 inch barrel, 14 inch barrel, choke tube, open choke, half choke, all these terms. And he was unable to say anything about the gun, beyond shotgun, smaller gauge. So then we look at what the witnesses said about the firearm that they allegedly saw at some point. And what did they say? Well, I'll tell you what they didn't say. They didn't say, I saw Scott Langford fire a shotgun. They didn't say, all of them didn't say, I saw a shotgun in a place I knew was Scott's residence. Or I saw a gun in Scott's residence that was under lock and key that only he had access to. Or I went hunting with him and he had a shotgun. None of that. If we look at Hannah Shearer, what she said was, I saw a firearm at his house. It was a bigger one. I don't know guns very well. It was, I only know bigger and smaller. And this is a bigger one. And I'm setting aside that she was a heroin addict, a meth addict at the time using those drugs. And that she was an ex-girlfriend of defendant for now. I'm just saying all, and she did not say it was a shotgun that she saw. So she was unable to say that. So for all those reasons, and I don't think I mentioned the standard of review, but I think it was an abuse of discretion to admit her testimony because she couldn't even say it was a shotgun. She just threw it out. And what the jury heard was, hey, you had a big gun. You had a big gun. So she did see a gun. She said, I saw a gun. It was a bigger gun, but could have been a handgun. Could have been a rifle. Could have been a BB gun. She never said anything beyond that. And she certainly didn't say shotgun. As to Mick Werger, he talked about September 22nd of 2017, a couple of weeks before the incident of October 5th. And he said he saw a shotgun. He knew a little bit more about guns. But he said, well, I was over at a place where on direct examination, he didn't even say he was at Langford's residence. He said, I dropped Hannah Shearer off there. And when I was there, I saw what looked like a shotgun in the corner, but it was never pulled out. And he said, he didn't know anything else beyond that. He didn't know if it worked. He didn't see, he didn't say if he was actually at Langford's house. He just said, Langford was there and I saw what looked like a pump shotgun. It could have been a pump shotgun. He said, we don't know if it was a working firearm, as I said, a replica, a toy, none of that. Again, I believe it was an abuse of discretion to introduce his testimony. And then finally, Macy Funiman, she said she saw a gun at some point. She was present on October 5th when the incident occurred. And it was black and long. She did not say a shotgun. So from her, the jury heard it was black and long. And I'm not, she also was on drugs at the time. She thought she was on bath salts. The police said she told him she was on cannabis. But setting that aside, she just said, I saw a gun. She didn't say shotgun. She said, I never touched it. I never saw it. I don't know if it was loaded. I don't know if it was unloaded. I don't know anything else about that. None of them did. None of them could say, I saw a working smaller gauge shotgun. And they never said they saw him fire it. They knew anything beyond it or that he ever- You know, Mr. Johnson, somebody fired a gun that had pellets in it. Right. I mean, so whether they describe it as a long gun a black gun, somebody saw him with the gun and there were pellets fired. Well, they didn't see him with a gun. They saw, they gave testimony about what looked like a gun. But to answer what you're getting at is, it is our position that the mad, drunken group of felons who came over looking for the daughters in a drunken rage had the shotgun that fired those pellets. It would have been coming from the wrong direction. I mean, it came from inside the house. It came from inside the- People were on the porch. It came from inside the house. I guarantee, I submit that is absolutely, we have to accept that. But we do not have to accept these people who told us they were on the porch. And that brings me to whether or not it was reversible. Bobby, first, Douglas Fundiman. And I understand this court does not want to assess credibility. And I'm kind of addressing now whether reversible error occurred and the sufficiency of evidence. But were these people on the porch? Well, Douglas Fundiman says they were. But Douglas Fundiman also engaged in a conspiracy of silence. Not only did he lie to the police for three years, his family did. He told other witnesses to lie, including Elizabeth Fundiman and Macy Fundiman. He said, no one will bring up Bobby Russell. And he lied. Chad Petard, I'm sorry, Douglas Fundiman also, his story was false. He came in and he said, I was fired at from 20 to 30 feet away. We know that's not true. We have to accept what Monet said and what the defense expert said. And that is- Counsel, wasn't there direct evidence from Russell, also known as Possum, that it was the defendant that shot at him with a shotgun? And the second witness, and I'll skip to, I'll come back to Fundiman if there's time. Bobby Russell. Bobby Russell, who made a kangaroo court out of the proceeding, was hidden and lied to the police for three years. And I'm asking what he testified to. He testified what he said was, and it's very interesting, the exact words he said were, apparently, he said, apparently, he had a shotgun. That's what he first said. And I submit to you, that makes what is much more likely from what he meant was that he's been told a story to tell. And that's what he, it's a very telling comment. Apparently, he had a shotgun. He's relating what he's supposed to say. Remember, we also, with Bobby Russell, when he went back to Elizabeth Fundiman's sister, Sigura, Sigura said, Bobby said he'd been shot by a BB gun. And he didn't even say it was Langford that shot him. Bobby didn't even know at the time if he was shot or not. And that makes sense since he was drinking 12 shots. He said, admitted to 12 shots of fireball whiskey. And he might've been drunk while he was testifying. So those are the two people, Fundiman and Bobby Russell were the only people that said that in this chaotic scene that they saw, Langford fired the gun. And I certainly understand that, yes, the witnesses thought they were on the porch, but I submit to you that they would not have had to been very far in the house. And when we're talking about these witnesses that come forward, that tell lies, that come forward, that try to hide Bobby Russell, and then they only come forward later. If we're talking about something that happened in a matter of seconds, and we're just talking about a few feet, it is much more likely that it was one of that pack that had the shotgun. And- Weren't there pellets in the doorframe? Yes, the gun- You don't get pellets that come from a shotgun that are fired by a BB gun. They don't, they weren't BBs. They were pellets from a shotgun, correct? Yes, yes. And that's why I say that, that's why Bobby Russell, just another thing he said wrong. He came back right after the incident and told a credible witness, one that wasn't, one of the few that wasn't drunk, I got shot by a BB gun. I'm not saying he got shot by a BB gun. I'm saying that it's just no story is consistent here. They contradict each other and they contradict the physical scene. This was a shotgun that was fired from inside the house, just inside the house. Right, and so the way we counter that, it is our position that these drunken fools had no idea, to look back in what they said three years later, and to say, well, they were just outside the house or they were on the porch. It can't, even if this court is hesitant as it is to assess credibility, having not seen the witnesses, in this case, this can't be accepted the way this case went down. The state doesn't have to do a perfect investigation. I understand that if they can carry their burden, they don't have to do a perfect investigation. But all the things I mentioned that they did not do, trying to test, they benefited from not testing this firearm, from not testing these shells. They benefited because then they invited the jury to speculate, well, we heard that Scott Langford had a big gun, he had a black gun, he had a long gun. So he had something that looked like a shotgun. That invited the jury to speculate that, well, he must have then, he must have fired that shotgun. But the law is, I'm certain- Okay, Mr. Johnson, you've had plenty of extra time. I'm gonna cut you off right there unless the justice has another question, because you were going on to another thought process. Justice Welsh, any other questions? No further questions, sir. Justice Moore? No. All right, Ms. Ray, Mr. Johnson, you'll have some time for rebuttal. Thank you. When you do have extra time, I would like you to address the difference between the aggravated discharge of a firearm and the reckless discharge of a firearm on rebuttal. Ms. Ray, what do you say on behalf of the state? Good morning, Your Honors. Well, I would like to first start with the firearms evidence which defendant opened with. There was a gun in defendant's residence. I don't think that there's any dispute about that, but it was introduced. Hannah Shearer said she saw a bigger gun in defendant's residence on the day of the shooting. Mr. McWhorter saw a shotgun just two weeks prior to the shooting. Macy Funiman, who was in the defendant's home when her father arrived at the house and then she subsequently left, she also testified that she saw a black and long shotgun. Additionally, Doug Funiman himself as well as Bobby Russell both testified that the defendant had a shotgun, was loading it, and they could tell by the way that he was holding it to load it that it was a shotgun. I'd like to also address defendant's contention that Mr. Funiman told Macy and his wife Elizabeth to lie. There's absolutely no evidence that that was the case that Funiman encouraged them to lie. Admittedly, they did hide Bobby Russell for quite some time, but the defendant is the one who actually located him first. So to address his contention in his brief that the defendant was surprised by the testimony of Bobby Russell, I submit to this court that that is not the case. Again, defendant's investigators found Bobby Russell, interviewed him, got a statement from him, and then shared that with the state. I believe it was 4.30 p.m. on a Monday afternoon, the first week or excuse me, the first day of the trial or the week of the trial. And so I don't think defendant was surprised or even prejudiced by Bobby Russell's being called to testify by the state. So that's the first thing. The second thing I would like to address is the question that Justice Cates asked defendant to address, and that is the reckless discharge. The inconsistent verdicts, I guess is what the court is asking. The reckless discharge requires a mental state of recklessness and the aggravated discharge requires a mental state of knowledge. And the jury was properly instructed as to the appropriate mental state for each of those charges. Each charge involved separate victims. The aggravated discharge of a firearm involved Douglas Fenneman. The reckless discharge involved others in the vicinity, which on the jury, did the jury instructions say that though, that the aggravated discharge was as to Fenneman and the reckless was as to the others? Um, I would have to look your honor. I don't recall if the jury instruction said that, but the charge I think, I think they were just generic jury instructions. And if they were, let's just assume that they were. Then how do you, how do you get around these inconsistent verdicts? You're letting the jury just kind of without direction meander through the list of people who were in that crowd. I understand your honor. I respectfully disagree with that because the charging documents themselves specified victims. Now the aggravated discharge specified Doug Fenneman. So when the jury received the aggravated discharge instruction, they would have known by the charging document that that victim was Douglas Fenneman and the reckless discharge victims. It didn't list victims specifically, but it said toward or in the direction of others. So certainly there were others in that same location that the firearm was being pointed at and discharged. And the others would have been Chad Pittard, Bobby Russell, Adam Pipkin's on the porch. And then within the home itself, defendants to young children. So the charging instrument set forth the two separate and distinct victims in that case. So the verdicts were not inconsistent. And certainly discharging a firearm in a home with children present is reckless. So both the people on the porch and the children were in danger of that reckless discharge by the defendant. Additionally, defendant's attorney admitted that he had a reasonable and good faith belief that the state's position, that the verdicts were not inconsistent, was the correct position to take. And Bustamante, as I've cited in my answer brief, supports that both charges in this case can stand because they're not inconsistent. There was only one shot fired, so it wasn't necessary to instruct the jury as to the mental states for the different shots, because there was only one shot. And the jury was indeed instructed, even if it was by general instructions. And I can check that if the court would like, but I just don't recall. Even if it was general instructions, the charging documents gave the jury guidance as to what victim for the aggravated discharge and what victims for the reckless discharge. So I don't think there could have been any confusion on the jury's part about that. Regarding the trial court permitting Bobby Russell to testify, again, I've already addressed that a little bit. But as to the ineffective assistance of counsel for not continuing to cross-examine Russell after he had agreed to cooperate, I'd like to address that just a little bit if I may. Defendant asserts that his counsel was ineffective for not continuing to cross-examine Russell after he agreed to finally cooperate. But as the record will reflect, defense counsel asked for a moment to speak with his client, the defendant, before continuing to engage in that cross-examination. And immediately upon concluding his discussion with the defendant when Russell was allowed to retake the stand, defense counsel said, I don't have any more questions for you if you don't want to answer them. I submit to this court that that was a trial strategy that had Russell cooperated if defense counsel had continued to ask him additional questions. That would have given Russell an opportunity to rehabilitate himself in front of the jury. And that would have precluded defendant from arguing the clown show and the circus-like atmosphere in the contempt that Russell allegedly showed in front of the jury. So some of the arguments that counsel was able to put forth in front of the jury as a result of what happened, as a result of defense counsel not continuing that cross-examination would not have been available to him to argue to the jury to say that, look, this guy's coming in here after three years, putting on a show, not wanting to cooperate. He's clearly guilty. Defendant would not have had that argument available had Russell been rehabilitated then because of cooperating if the cross-examination had continued. Additionally, defendant didn't meet the second prong of Strickland either. The evidence in this case was not closely balanced as I've noted in my answer brief. Yeah, there were some inconsistencies in the Fenneman's testimony, certainly, and some inconsistencies in Bobby Russell's testimony. But the inconsistencies in Doug Fenneman's testimony weren't about essential elements in this case as to any of the charges. There's nothing in any of the charges that says a certain distance has to be present or identified in order to satisfy the reckless or aggravated discharge of a firearm. And additionally, there's nothing that says that, you know, those minor inconsistencies discredit the entire testimony of the Fenneman's or Russell. And beyond that, the physical evidence supports what Doug Fenneman and Bobby Russell said that the gun was fired from inside the home as Justice Cates noted earlier. That physical evidence demonstrates that the shot was fired from inside. If you look at this record, the only person that was inside the home, the only adult that was inside the home who could have fired that firearm was the defendant himself. The only two other people who were inside the residence at the time that that shotgun blast was fired were the defendant's children. And there's absolutely no evidence whatsoever or even an implication or suggestion that those children would have fired that gun. It is clear from the circumstantial evidence in this case, from the direct testimony in this case, that defendant is the one who fired the gun in the direction of Doug Fenneman, Chad Pittard, Bobby Russell, and even his own house guests who puts all these people on the porch himself. Adam Pipkin was there and was fired. The gun was fired in his direction. We ask this court please to confirm the defendant's convictions based on the record in this case. Thank you. Uh, Justice Welsh, any questions? No questions. Justice Moore? No. Okay, thank you, Ms. Wray. Mr. Johnson, reply? You're on mute, Mr. Johnson. I apologize. Yes, thank you, Your Honor. With regard to the inconsistent verdicts argument, the instructions were generic. As to the reckless discharge of a firearm instructions that appears in the report of proceedings at 1142. And it just states, person commits the offense of reckless discharge of a firearm when he discharges a firearm in a reckless manner, which endangers the bodily safety of an individual. And then the aggravated discharge instruction is on 1144 of the report of proceedings. So nothing is directed or can be sorted out from the jury instructions as to which victims of the- Did that go to the jury? I don't believe the charging document went to the jury. The charging documents did, you know, reckless named multiple individuals and the aggravated discharge charging document mentioned Doug Funiman. But Doug Funiman is included in the group of individuals that are the multiples individuals for the reckless discharge. So what happened is the trial proceeded and there was no theory, there were no arguments, there were no witnesses, there was nothing to differentiate those charges. And not even in closing argument, was there anything to differentiate or make this clear to the jury. It was only after the judge said he thought the verdicts were inconsistent after the trial that he invited briefing. The state filed a memorandum and the defendant did not. And I agree that the counsel is correct that the defense attorney said, they aren't inconsistent or whatever. But I think this court is the judge of that, not the lawyer. And so we believe the verdicts were inconsistent. You can't be reckless with the same group of victims and knowing at the same time. And then just briefly with regard to some of the other comments. Well, could you intend to shoot Funiman and be reckless as to the others? But you possibly could be, you can't, but the charging instruments and the jury was never advised of anything like that. And Funiman was included in the reckless discharge instruction. So there would be two different mental states. With regard to whether or not Macy Funiman was told to lie, Elizabeth Funiman, one of the only sober people there who did not place a shotgun in defendant's hands said that, I do believe that she admitted that they did all agree to keep Bobby Russell out of it. And that it was when asked who told Macy, Ms. Funiman said, I believe we did. Or she's sure we did. So I believe I did not mistake the record on that. Whereas Doug Funiman was not consistent with the crime scene because he said before he knew what the ballistics would show, he said that the gun was fired 20 or 30 feet away from him. So I won't go back into all the evidence, but just with all the baggage of these witnesses, the grants of immunity, this was a focus to get Scott Langford, who was, he had prior felonies. I mean, I think we know what happened here. They wanted him. And that's why they didn't go to Chad Pittard to ask him where the gun was. And that's why they didn't go to Bobby Russell, even though they did know he existed. So I think just under these circumstances, it was certainly admitting all those guns, firearms, they are not suitably connected to the defendant and admitting them was not harmless error. It was reversible. And even beyond that, I believe the evidence was insufficient. Thank you very much. Okay. Justice Welch, questions? No questions. Justice Moore? No questions. All right. Thank you, Mr. Johnson. Thank you, Ms. Ray. This matter will be taken under advisement. We'll issue an order in due course.